MEMORANDUM OPINION
 

 DONALD J. PORTER, District Judge.
 

 CASE SUMMARY
 

 Plaintiff, as subrogee of its insured, Kerr-McGee Corporation, brought these actions, (consolidated for trial) to recover for property damage to a twin jet Kerr-McGee aircraft which crashed on take-off from the Watertown Municipal Airport. Jurisdiction of plaintiffs’ tort action against the City of Watertown, owner and operator of the airport, is grounded in diversity, 28 U.S.C.
 
 *1216
 
 § 1332(a). Plaintiff sued the United States under the Federal Tort Claims Act, 28 U.S.C. § 2671, et seq.; jurisdiction lies under 28 U.S.C. § 1346(b). After trial to the court, on the merits, this Court finds from all the evidence, and adjudges (1) that the negligence of defendant City was the proximate cause of the loss; (2) that plaintiff was not contributorily negligent; and (3) that the United States is not liable under the Federal Tort Claims Act.
 

 FACTUAL BACKGROUND
 

 A Saberliner jet aircraft owned by the Kerr-McGee corporation arrived at the airport in Watertown, South Dakota, at approximately 11:00 a. m. on Saturday, June 14, 1975. At approximately 4:30 p. m., the airplane, piloted by Kerr-McGee’s chief pilot, Jack Irwin, and co-piloted by Ralph Hill, began its departure. They were informed by employees of the Federal Aviation Administration (FAA) in the Flight Service Station (FSS) at the airport that the visibility was about a mile and a quarter (the day was rainy) and that because of the prevailing wind, the “favored” runway was 17-35, running north-south.
 

 The Saberliner taxied to the north end of 17-35, turned, and started its take-off roll. About 3,000 to 3,500 feet down the 6,900 foot runway, the aircraft reached take-off speed and lifted off. Almost immediately, and while at an altitude of 25 to 100 feet, the plane encountered a flock of Franklin gulls. Some of the gulls were ingested into the airplane’s two jet engines, all power was lost, and the pilot made an emergency landing in a field south of the airport. The pilot and co-pilot and one passenger received some injuries; the Saberliner was a total loss. The parties have stipulated the loss to be $1,787,872.00.
 

 I.
 

 Duty of the United States under 14 C.F.R. Part 139.
 

 Plaintiff’s first ground for recovery against the United States is that the FAA negligently certificated the Watertown airport under 14 C.F.R. Part 139, and thereafter was negligent in failing to enforce its regulations under that Part. The certification process, which was initiated in 1973, required that no person could operate an airport “serving any CAB-certificated air carrier operating aircraft into that airport, . . . without . . an airport operating certificate.”
 
 [1]
 
 14 C.F.R. § 139.3 (1975). As the regulations state, an airport is eligible for a certificate if the FAA “after investigation, finds that the applicant is properly and adequately equipped and able to conduct a safe operation in accordance with this part, and approved the airport operations manual submitted with and incorporated in the application.” 14 C.F.R. § 139.11(b)(1975). Among many other requirements for the preparation of the airport operations manual, the “applicant . . . must show that it has established instructions and procedures for the prevention or removal of factors on the airport that attract, or may attract, birds. However, the applicant need not show that it has established these instructions and procedures if the Administrator finds that a bird hazard does not exist and is not likely to exist.” 14 C.F.R. § 139.67 (1975).
 

 When Watertown submitted its airport operations manual in compliance with these regulations, it stated, under the category of “Birds”, that there were “[n]o problems at present time.” The FAA accepted this statement and, without an independent inspection of the Watertown airport, approved the manual and issued a certificate to the airport in March, 1973. The FAA thereafter conducted annual inspections of certificated airports, 14 C.F.R. § 139.5 (1975). The Watertown airport’s 1975 FAA inspection took place on June 4, ten days prior to the Saberliner accident. The report of this inspection, in a letter of June 6, 1975, from the Chief, Airport Certification Staff to the Watertown airport manager found “no discrepancies or violations to Federal Aviation Regulation Part 139.”
 

 
 *1217
 
 Plaintiff alleges that the FAA knew or should have known that the Watertown airport did in fact have a bird problem, that the FAA was negligent in allowing Water-town to have a valid certificate without requiring it to embark on a bird control program, and that the FAA was negligent in later failing to discover the bird problem and in not thereafter requiring a bird control program. To make out a cause of action under the Federal Tort Claims Act (FTCA) using this theory, plaintiff must overcome the authority of a number of cases, including
 
 Davis v. United States,
 
 395 F.Supp. 793 (D.Neb.1975), aff’d, 536 F.2d 758 (8th Cir. 1976). In
 
 Davis,
 
 an OSHA inspector issued a citation for a dangerous trench, but never made a follow-up inspection. A short time later, plaintiff’s decedent was killed at the site of the inspection when a trench collapsed on him. An action was brought alleging negligence on the failure to follow up. The United States raised the defense it raises here- — that since the law of the state in which the accident occurred, Nebraska, placed no duties on private persons like the duties undertaken by OSHA inspectors, the complaint did not state a claim under the FTCA.
 
 [2]
 
 The court granted defendant’s motion to dismiss, saying that OSHA’s “thrust is to require designated federal officers to investigate, issue citations, and apply for enforcement orders by a federal court. Nothing resembling those duties devolves on a private person under OSHA.... To the extent that the complaint ... is rooted in federal law as a source of duties of the United States or its compliance officer, it must fall.” 395 F.Supp. at 795-96. The case was distinguishable from cases in which persons who controlled dangerous operations were held to have a duty to protect workers; “here the federal compliance officer was not in control, either actually, contractually, or otherwise. He performed inspection duties solely because of the federal laws and cannot be said by the common law of Nebraska to have been ‘responsible’ for or in ‘control’ of the project.” 395 F.Supp. at 796.
 

 This ruling was consistent with
 
 Kirk v. United States,
 
 270 F.2d 110 (9th Cir. 1959), where the plaintiffs alleged that the United States had been negligent in failing to carry out an accident prevention and rescue program for the employees of one of its independent contractors at a dam site. This duty, the plaintiffs contended, was enjoined by statute and regulations. The
 
 Kirk
 
 court found that the plaintiffs had “utterly failed to establish the existence of the legal duty upon which they rely. . . . [T]he general rule is that a statute which does not purport to establish a civil liability, but merely makes provision to secure the safety or welfare of the public as an entity, is not subject to a construction establishing a civil liability.” 270 F.2d at 117.
 
 See also United States v. Smith,
 
 324 F.2d 622 (5th Cir. 1963);
 
 Gelley v. Astra Pharmaceutical Products, Inc.,
 
 610 F.2d 558 (8th Cir. 1979);
 
 In re Franklin National Bank Securities Litigation,
 
 478 F.Supp. 210 (E.D.N.Y.1979);
 
 Mercer v. United States,
 
 460 F.Supp. 329 (S.D. Ohio 1978);
 
 Thompson v. United States,
 
 592 F.2d 1104 (9th Cir. 1979): (“the mere provision for government safety inspections, or the ability to stop an activity for failure to comply with safety standards, does not impose liability on the government for failure to do so. A government safety manual or safety program does not impose a special duty on the government.” 592 F.2d at 1110).
 

 Both plaintiff and defendant United States urge the case of
 
 Clemente v. United States,
 
 567 F.2d 1140 (1st Cir. 1978), as persuasive authority, and to varying degrees it does support both parties’ positions.
 
 Clemente
 
 arose out of the crash of a private plane, with plaintiffs alleging that the crash had been caused by the negligence of the FAA in failing to warn the passengers that the aircraft was overweight and lacked a proper flight crew. Plaintiffs argued
 
 *1218
 
 that the duty to warn had been imposed on the FAA by an order issued by the FAA Director of the Southern Region. Analyzing the issue, the
 
 Clemente
 
 court observed that:
 

 [n]ot all acts and orders of the United States government are so sovereign that they must be treated as commands which create legal duties or standards, the violation of which involves breaking the law. A considerable part of the government’s conduct is in the context of an employer-employee relationship, a relationship which includes reciprocal duties between the government and its staff, but not necessarily a legal duty to the citizenry. 567 F.2d 1144.
 

 Clemente,
 
 however, seemed to suggest that liability could be imposed on the United States under certain factual circumstances, particularly those falling within the “Good Samaritan” doctrine and
 
 Indian Towing Co. v. United States,
 
 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955).
 
 [3]
 
 “[W]hen the government gratuitously undertakes to perform a service upon
 
 which members of the public justifiably rely,
 
 it will be held to an appropriate standard of care in carrying the service out.” 567 F.2d at 1148. (emphasis in original). But, the
 
 Clemente
 
 court pointed out, “[tjhere is no indication in the present case that plaintiffs’ decedents or anyone else for that matter have ever relied on the FAA to inspect a charter aircraft before they embark on a private flight.”
 
 Id.
 

 The
 
 Indian Towing—
 
 Good Samaritan doctrine has been more fully developed in several other cases, notably
 
 United Scottish Ins. Co. v. United States,
 
 614 F.2d 188 (9th Cir. 1979). This case also arose out of the crash of an airplane which, plaintiffs alleged, had been negligently inspected by the FAA.
 
 United Scottish
 
 expressly differed with the Eighth Circuit’s ruling in
 
 Davis v. United States, supra,
 
 saying that “[w]hile the existence of a federal statutory duty as the reason for undertaking the action will not automatically create liability, neither will such a duty preclude liability. The crucial inquiry is whether, in undertaking the inspection, a duty arose under state law because of the relationship thereby created — the good Samaritan rule.” 614 F.2d at 193-94. But the requirements of the Good Samaritan doctrine — “ ‘[the defendant] in some positive way must have contributed to the injury, either by increasing risk of harm, ... by interposing himself between another person and the duty that the other person owed to someone else, . . . or by inducing reliance on his undertaking.’ ” 614 F.2d at 195, citing
 
 Blessing v. United States,
 
 447 F.Supp. 1160, 1199 (E.D. Penn.1978) — must be satisfied. If these elements are not met, said
 
 United Scottish,
 
 “the government may not be held liable pursuant to the Act for negligence in inspection of private activities or property, although federal statutes or regulations direct that government employees undertake the inspection activity.” 614 F.2d at 195.
 

 As plaintiff points out, South Dakota does recognize the Good Samaritan doctrine.
 
 Steckman v. Silver Moon,
 
 77 S.D. 206, 90 N.W.2d 170, 173 (1958), stated the elements of the doctrine in a manner equivalent to that stated in
 
 United Scottish
 
 and
 
 Blessing:
 
 “[t]he liability in most cases has arisen because defendant made the situation worse, either by increasing the danger, or by misleading plaintiff into the belief it had been removed, or by inducing him to forego the possibility of help from other sources.” Though, as noted above, it is by no means clear that this Circuit recognizes claims brought under the FTCA for the violation of federal regulations, even taking the Good Samaritan doctrine into consideration, it makes no difference in this case, because this Court finds that plaintiff has failed to prove that it has satisfied the elements of the Good Samaritan doctrine. Plaintiff does not claim, and could not
 
 *1219
 
 prove if it did, that the FAA’s certification and inspection program increases the risk of bird strikes at certificated airports.
 
 [4]
 
 Neither does plaintiff allege, and the evidence would not support the contention, that the FAA has interposed itself between the Watertown airport and the duty that airport may have owed plaintiff. For, to be rendered liable under this Good Samaritan element, the FAA must have undertaken “not merely to
 
 supplement
 
 the [airport’s] own safety inspections, but rather to
 
 supplant
 
 those inspections,”
 
 Blessing,
 
 447 F.Supp. at 1194, (emphasis in original) and this circumstances does not appear in this case.
 
 [5]
 

 Plaintiff does claim to meet the reliance requirement, but here again, the evidence does not support this contention. There is no indication in the testimony of the pilot and co-pilot that either man was even aware of the certification process under 14 C.F.R. Part 139, let alone that they relied on it. Plaintiff contends that “[a]ll pilots rely on government certified airports to be clear of hazards,” but any such reliance would appear to be a reliance on the airport
 
 manager
 
 to keep the airport hazard-free, not on FAA inspectors to ensure that the manager is doing his job. This is reflected in the testimony of the pilot, who in response to the question of what could have been done to avoid the crash, said “the only thing I can see would be — have the — some
 
 airport personnel
 
 have closer inspection of the runway conditions and report it to the flight service station, where it could be reported to the pilots.” (Irwin deposition, p.82) (emphasis supplied). Similarly, the copilot testified that “the
 
 airport authority, or whomever is in charge of the airport,
 
 whoever that is, would be responsible for reporting the birds, as I would see it.” (Hill deposition, p.56) (emphasis supplied).
 

 The pilots’ lack of reliance upon the FAA certification program is understandable, since the program had only commenced in 1973, with this accident occurring in 1975. As the court in
 
 Clemente
 
 noted, “[i]t may be that in carrying out [the regulations] over a period of time, the FAA staff’s conduct will engender sufficient justifiable reliance to create an actionable duty of care, but this is fundamentally different than deriving such a duty from the mere issuance of [regulations].” 567 F.2d at 1149.
 

 This Court must therefore reject plaintiff’s contention that 14 C.F.R. Part 139 imposed any sort of duty under state law on the FAA that would give rise to a tort action for its violation. But even if it be assumed that such a duty could exist, plaintiff has failed to show the requisite reliance necessary to recover under
 
 Indian Towing
 
 and the Good Samaritan doctrine. Thus, insofar as the complaint purports to state a cause of action against the United States for a negligent violation of 14 C.F.R. Part 139, either in issuing a certificate or later failure to discover and correct the bird problem, it must be dismissed.
 

 II.
 

 Negligence of the Watertown Airport Operator.
 

 The basic elements of a negligence action are that there be a duty owed by the defendant to the plaintiff, that there was a breach of this duty, and that the breach of the duty was the proximate cause of plaintiff’s injury.
 
 Stoner v. Eggers,
 
 77 S.D. 395,
 
 *1220
 
 92 N.W.2d 258 (1958). This Court has no hesitation in finding, and defendant City of Watertown [City] does not appear to dispute, that the operator of a public airport has a duty independent of federal statutes and regulations to the pilots using the airport to use reasonable care to keep the airport free from hazards, or at least use reasonable care to warn of hazards not known to the pilots.
 
 [6]
 
 Neither does defendant City seem to dispute that, at least when jet aircraft are involved, birds are one of the hazards that must be controlled at an airport. Defendant City does dispute, however, that there had ever been a problem with birds, specifically Franklin gulls, at the Watertown airport. Much of the trial time was spent attempting to resolve this issue, and this Court finds that the preponderance of the evidence is contrary to defendant City’s position. There seemed to have been almost a complete uniformity of opinion among the witnesses who were familiar with the Water-town airport that gulls were there in substantial quantities from early spring to late fall for as long as any of the witnesses had been there. Only two witnesses testified to seeing no birds: William Moore, FAA inspector, who was at the Watertown airport only one day a year, and James Jacobson, the pilot who last used the airport before the crash,
 
 [7]
 
 and had used the airport only eleven times in 1975. The witnesses who saw the gulls, on the other hand, were
 

 mostly those who were either stationed at the airport, or who used it frequently.
 

 Every one of the witnesses who saw gulls saw them everywhere on the airport property, including the runways, at various times, and all of these witnesses seemed to consider them a threat to the aircraft that used the airport. Bernard Letze, the airport manager, had chased them off before June 1975, and had apparently arranged for warning Notices to Airmen (NOTAMs) to be issued in the fall when he considered them to be particularly bad. Kenneth Baenen and Dale Dahl, the personnel at the FAA flight service station (FSS) on duty the day of the accident, had both seen gulls and had gulls reported to them, and had issued warnings prior to June 1975. Jerry Wyland, a North Central Airlines ticket agent, had seen gulls and warned the airline pilots and informed the airport management three to five times a month prior to June 1975. Marvin Nelson, a Minnesota Rubber Co. pilot flying Lear Jets, who had been using the airport twice a week since 1966, had seen gulls everywhere on the airport property. He testified that he had made passes to avoid the gulls, had hit gulls flying in, and had told the airport management about them. And several local pilots and mechanics, Ed Shell, Ron Kaszowski, and Bob Gisie, had all seen large numbers of gulls around the airport, Kaszowski going so far as to say he had seen enough to cover a section of the runway.
 

 
 *1221
 
 The testimony seems to indicate that the heaviest gull infestation was in the early spring or in the fall, not in June. The only NOT AMs Letze mentioned were issued two weeks in the fall; Ed Shell said the gulls coincided with the planting in April and May; Jerry Wyland said usually in March, April and May; Marvin Nelson said spring and fall, though mainly in the fall. But though the greatest number of gulls were in the months before or after June, there were usually a significant number of gulls at the airport in June. Dahl, one of the FSS personnel in Watertown since 1950, said he had seen gulls in the vicinity in June, on the ramp surfaces at the airport within the week before his June, 1978 deposition, and that there had been no difference in the gull presence on the airport paved surfaces since 1950. Letze, whose deposition was taken at the same time, acknowledged that he had chased gulls off the ramp ten days earlier in June, 1978. Baenen said he saw gulls in the vicinity in the days before the crash, and David Windham, an attorney for Kerr-McGee who investigated the accident, testified at length about the flock of gulls he saw on the same runway three days after the crash, as well as the gulls he saw nearby the runway on June 15, 1975, the day after the accident.
 

 There was also testimony on the question of whether rainy weather like that on June 14, 1975, would make it more likely for the gulls to be present. Baenen, one of the FSS personnel at Watertown, and Donald Woodward, an FSS specialist who had worked in Minnesota, denied that there was any correlation between the weather and the gulls. On the other hand, Marvin Nelson, the pilot who reported having had the most trouble with gulls, said they were more prevalent if it was a rainy and cold day, and Bob Gisie repeated this. Johnsgaard, plaintiff’s ornithologist, said that wet weather forces worms, a source of food for gulls, out of their holes, and Letze conceded that worms might go onto the runway during “awful heavy rains”, though he did not consider the rainfall on June 14, 1975, to be an “awful heavy rain.”
 

 It seems significant that Warner, defendant’s ornithologist, went no further in his testimony than to say that there was nothing about the Watertown airport that would attract gulls more than would any other place in South Dakota, and that the gulls occurred in the same frequency in the neighboring fields. It might be observed that Letze testified by deposition in June, 1978 that it was not unusual for there to be thousands of gulls in a
 
 plowed
 
 field a mile from the airport, and Dahl said there had been gulls in the Watertown area in the summer since he first arrived in 1950.
 

 Finally, there is the point urged by Letze and Dr. Warner that there is no “bird problem” unless the birds are there habitually and predictably, coming every day to the same place, at the same time, in the same number. It is true that the witnesses agreed on the unpredictability of the gulls: Letze, Wyland, Kaszowski, and Nelson all said that there might be days or weeks when gulls wouldn’t be seen, and both ornithologists emphasized the unpredictability of the age-type of gulls that were involved in the wreck. Letze said that the gulls could be
 
 anywhere
 
 on the airport, runway, ramp, or fields, and favored no particular place. Yet, given the testimony set forth above, the conclusion seems inescapable that it was reasonably foreseeable by the City, as airport operator since about 1946, that gulls could be on the runway on June 14, 1975, and if they were, they would constitute a hazard to jet aircraft, especially on take-off.
 

 The gulls were a particularly serious hazard, given their physical attributes and instincts. As described more fully in a later part of this opinion, the gulls are small in size and difficult to see because of their dark coloring. The gulls flock together— they were usually in a flock when. Letze saw them — and when frightened, take off in a mass. This take-off is especially dangerous for fast-moving aircraft, since the gulls with their long wings move slowly and go straight up into the path of the aircraft, rather than moving out of the way to the side. Letze acknowledged that he had seen
 
 *1222
 
 them
 
 go
 
 up over an airplane, then settle back down on the same section of runway. Considering the speed which a Saberliner must achieve to reach take-off, between 130-150 miles per hour, the correspondingly reduced time in which to react to emergencies, and the power loss on take-off from bird ingestion in a jet engine, the hazard becomes very serious indeed. The facts must be evaluated in light of the doctrine that “[njegligence arises from breach of duty and is commensurate as to time, place and circumstances. The greater the danger, the greater the care required, so that a very high degree of danger calls for a very high degree of care which, however, amounts to ordinary care in view of the situation and circumstances.”
 
 Bucholz v. City of Sioux Falls, 11
 
 S.D. 322, 91 N.W.2d 606, 612 (1958).
 

 It may be true, as defendant City of Watertown contends, that it would have been impossible to eliminate the gull problem. Certainly, both ornithologists testifying indicated that there was virtually nothing that could be done in varying the land use around an airport, including use of a “scorched earth” policy of poisoning and defoliation, that would guarantee that the gulls would not be present.
 
 [8]
 
 It may also be true, as Watertown suggests, that because of the unpredictábility of the gulls, no reasonable amount of inspection would have revealed their presence before the accident.
 
 [9]
 
 But there was another method of dealing with this problem: the issuance of NOT AM warnings.
 
 [10]
 

 This method was known to airport management. Letze himself testified that he had previously caused NOTAMs to be issued in the fall when he considered the gull presence to be particularly heavy. Even if this procedure had not been specified in the regulations, this Court holds that defendant City would not have been relieved of its duty to warn, but because the method of warning
 
 is
 
 specified in the regulations, it is additional proof of the negligence of defendant City. 14 C.F.R. § 139.69 (1975) states:
 

 (a) The applicant for an airport operating certificate must show that it has appropriate procedures for identifying, assessing, and disseminating information to air carrier users of its airport, by Notices to Airmen or other means acceptable to the Administrator, concerning conditions on and in the vicinity of its airport that affect, or may affect, the safe operation of aircraft.
 

 (b) The procedures prescribed by paragraph (a) of this section must cover the following conditions: . . .
 

 (7) The presence of a large number of birds.
 

 William Moore of the FAA testified that many of the airports in this region have permanent NOTAMs, apparently printed in the Airmens’ Information Manual, and there is no indication why it would not have been possible for one to be issued for the Watertown airport.
 

 The pilot of the wrecked aircraft testified that it was normal procedure to “check all the NOTAMs on every place you were going in on ... to be sure there weren’t any birds as a normal — normal bird hazard in the area . . . some airports are more notorious for birds than others.” And, when asked what could have been done to avoid the accident, the pilot complained that “we had no notification of there ever having been birds in the area or even on the runway or in the area, as far as that’s concerned; we had no NOTAM-NOTAMs or no notification of there ever being any birds
 
 *1223
 
 around that particular airport.” With warning, testified plaintiff’s expert Saber-liner witness, the pilot and co-pilot would have used a variety of cautionary procedures, and probably avoided the accident entirely. If the gulls had been seen before the Saberliner lifted off the ground, which this Court must find would have been more likely with a warning, the airplane could have stayed on the ground until it was past the flock, and then taken off (half the runway was still left), or even if it had reached take-off speed, take-off could have been safely aborted. The danger to the jet from the gulls on the runway was greatest immediately after lift-off, at which time the birds were first seen rising up from the runway, into the path of the plane.
 

 This Court therefore finds that the Watertown airport, under all the circumstances, owed the pilots of the crashed Saberliner jet a duty to warn them of the possible presence of gulls; that defendant City breached this duty by failing to so warn; and that the failure to warn was the proximate cause of the crash.
 

 III.
 

 Negligence of the Watertown Airport Flight Service Station Personnel.
 

 Plaintiff also contends that the FAA employees at the Watertown airport were negligent in failing to warn the Saberliner of the gulls on the day of the accident. These personnel were in the Flight Service Station (FSS) located on the ground floor of the Watertown airport terminal, and their duties involved the dissemination of weather information and flight advisories. FSS personnel may also relay air traffic clearances to pilots from an Air Route Traffic Control Center, but they do not “control” air traffic; [there is no control tower at the airport] rather, FSS personnel merely act as a conduit of certain types of advisory information for pilots.
 

 This advisory information includes hazards presented by birds, and both FSS personnel on duty on June 14, 1975 acknowledged they had issued bird warnings prior to the day of the accident. These warnings, like the other information disseminated by FSS personnel, were issued after the personnel had either made a direct observation of a condition, or were informed of the existence of a condition by airport management or pilot reports. On the day of the accident, however, the FSS personnel testified that they neither saw gulls on the airport nor received any reports of their presence.
 

 It might still be argued, though, that knowledge of a persistent gull problem had to be common property at a small airport like that at Watertown, and that a warning should have been given the Saberliner even without the FSS receiving a report. But there are problems with this position. The FSS personnel stepped just outside their station once each hour to check the weather, from which point they were, because of terrain or high grass, unable to see the runway surface on 17 — 35, the runway involved here. Moreover, their view from inside the station of portions of the airport, particularly runway 17-35, was somewhat restricted. The FSS personnel appeared to have little knowledge of the airport inspection program, and seemed not even to know there was no weekend inspection. The airport management, on the other hand, was the only entity (aside from aircraft) authorized to be on the runway surface, and except on Saturdays and Sundays, performed daily inspections of the airport area. Also, in the summer, airport management conducted farming operations on the area, thus gaining a greater familiarity with the airport grounds and any problems potentially hazardous to aircraft in the airport area. And, it should be noted, when witnesses testified that they had complained about the gulls, they said they spoke to the
 
 airport manager,
 
 who presumably then relayed the information to the FSS.
 

 Further, under the airport operations manual, which was required to be kept current under 14 C.F.R. § 139.31(b), the airport management was “responsible . . . for all General Supervision of the Watertown Municipal Airport. The Airport management is responsible for all the operation
 
 *1224
 
 management and maintenance of the airport and all its facilities and equipment.” Further, federal regulations in 14 C.F.R. Part 139 (1975) indicate that it appears to be the
 
 airport operator’s
 
 duty to identify safety problems on the airport and to disseminate this information by NOTAMs.
 
 [11]
 

 These regulations appear to formalize what would in any case be the reasonable method of conducting operations at an airport such as that at Watertown. Because of the management’s much greater familiarity with the airport, stemming from its direct responsibility for airport inspection and overall operation maintenance, the primary duty must be on the management to keep informed concerning conditions potentially hazardous to aircraft using the runways, and to arrange with the FSS for an appropriate warning to be given.
 

 Considering that the management can see the problems “close up”, while the FSS personnel only appear to know of most problems at second-hand, it would seem to cast an unreasonable burden on the FSS personnel to decide that some problem is of such magnitude that it requires a permanent NOTAM without first receiving a decision to that effect from the management.
 
 [12]
 
 If the FSS personnel could be shown to have actually observed, or learned from a radio report from a pilot flying on or over the airport of a hazardous condition developing and thereafter failed to report it, a different case would be presented. But there is no indication that either of the FSS personnel on duty on June 14, 1975 saw or were notified of the gulls present on the airport runway that day. This Court can find no basis for holding the FSS personnel negligent for failing to give the Saberliner any warning of gulls for June 14, 1975. The Court also takes the view that plaintiff has not made a sufficient showing that the FSS personnel had adequate knowledge of the actual extent of the persistent gull problem at the Watertown airport to be found negligent for failing to issue, independently of the airport management, a permanent NOTAM warning for gulls.
 

 IV.
 

 Pilot’s Contributory Negligence.
 

 This Court must next consider whether the Saberliner pilots were contributorily negligent under South Dakota law, and if so, the applicability of SDCL 20-9-2, the South Dakota comparative negligence statute.
 
 [13]
 
 As defined by the State courts, “[contributory negligence is conduct for which the plaintiff is responsible amounting to a breach of duty which the law imposes upon persons to protect themselves from injury, and which, concurring and cooperating with the actionable negligence for which defendant is responsible, contributes to the injury complained of as a proximate cause.”
 
 Cowan v. Dean,
 
 81 S.D. 486, 137 N.W.2d 337, 341 (1965). The standard by which a plaintiff’s conduct is tested is “that to which a reasonable man would conform under like circumstances.”
 
 Haase v. Willers Truck Service,
 
 72 S.D. 353, 34 N.W.2d 313, 314 (1948).
 

 There is no dispute that the “pilot in command of an aircraft is directly responsible for, and is the final authority as to, the operation of that aircraft.” 14 C.F.R. § 91.3(a). This includes a duty to see what can be seen, and to separate his aircraft
 
 *1225
 
 from obstructions and hazards, including birds. The parties were agreed that a pilot should learn about possible obstructions at an airport before flying into that airport.
 

 Irwin, the pilot of the wrecked Saberliner, was aware that birds were a possible hazard to jets such as the one he flew. He had flown 22,000 miles over many years to all parts of the United States, including one prior flight to Watertown some years before, and eight or ten trips to other sections of South Dakota and frequent trips into Minnesota. Hill, the co-pilot, had himself flown since 1943, and had made many trips with Irwin. He also had been aware of the hazard birds could present to aircraft.
 

 Before the flight to Watertown, Irwin testified that he checked NOTAMs for warnings on the Watertown airport, and found nothing relating to birds. There was-light rain at Watertown when the Saberliner arrived there, and it continued throughout the day. An hour or so before the time of departure, when Irwin filed his flight plan, the FSS personnel told the Saberliner crew that there was mile and a quarter visibility, though the pilot was of the opinion that the visibility was actually a half-mile to three quarters of a mile, or “maybe more.” When the passengers boarded the aircraft at about 4:15 p. m. that afternoon, the Saberliner crew radioed the FSS and asked for their clearance for takeoff. The clearance, which the FSS relayed to the Saberliner from Minneapolis, was radioed to the crew just before the Saberliner began its taxi, or as it taxied out the approximately 2,500 feet to the north end of runway 17-35. The crew was not using the windshield wipers on the Saberliner. At least some of its lights were turned on.
 

 At the end of the runway, the Saberliner either hesitated only briefly, or turned immediately onto the runway to begin its takeoff. Both pilot and co-pilot looked down the runway, but saw no obstructions. As the aircraft accelerated, rapidly approaching the lift-off speed, the co-pilot spent virtually all his time looking down at the instruments, while the pilot alternated between looking at the instruments and looking at the runway. When the Saberliner began to leave the ground, the co-pilot looked up, saw a flock of gulls around the Saberliner coming up from below, and told the pilot. Almost immediately thereafter, the aircraft lost power, and crashed beyond the end of the runway.
 

 Thus, the total precautions which the crew- took against a possible bird hazard seem to have been to check for NOTAMs concerning the Watertown airport, and to look briefly down the runway before beginning their takeoff. Though it is unclear how many of the Saberliner’s lights were on, those lights that were switched on do not appear to have been turned on as a bird precaution. Likewise, the engine ignitions and the radar appear to have switched on, procedures which have been described as bird precautions, but the testimony of the crew does not suggest that these were, in fact, intended as precautions. But, “the taking of some safety precaution, however inadequate it proved to be to prevent the accident, [has] significance” in the determination of a plaintiff’s negligence.
 
 Associated Engineers, Inc. v. Job,
 
 370 F.2d 633, 641 (8th Cir. 1966).
 

 It has been argued that pilots with the extensive experience of the Saberliner crew, having flown to every part of the United States, should have been more cautious about possible bird hazards, even in the absence of a NOTAM for the Water-town airport. The particular birds involved in this accident, Franklin gulls, have a widespread migration pattern throughout this region, and it is clear that there are bird hazard problems at airports other than Watertown. William Moore of the FAA testified that there are permanent birds NOTAMs at many airports in the region, and Marvin Nelson, another jet pilot who frequently flew into Watertown, said he was constantly on alert for and took precautions for birds at every airport he flew into and out of, whether or not he actually knew there was a bird problem at that airport. Though it seems to be clear that Nelson’s particular precaution, turning on the engine ignition during takeoff, was, in
 
 *1226
 
 fact, ineffective to prevent this accident due to the heavy damage the gulls caused to the Saberliner’s engines, it is still argued that there were other precautions that could have been taken which might have been more successful. These precautions include turning on the landing lights to attempt to scare the gulls away, using a different runway, taxiing down the runway for a look, asking the co-pilot to deviate from his normal duties to help keep a lookout, or turning on the windshield wipers.
 

 Yet almost all these precautions amount to relatively significant alterations of the normal routine in the takeoff of a Saberliner. The use of the windshield wipers in the light amount of rain present on takeoff that day was described by virtually all the pilot witnesses as being extremely unusual and, perhaps, would have contributed nothing to visibility. The Saberliner had a slanted windshield and, according to the pilot, “water runs off faster than the wipers can keep up with it on a light rain,” The wipers had to be turned off shortly after takeoff, adding to the crew’s complex procedures; otherwise, on a jet aircraft, they would be destroyed by the high speed. It is significant that the co-pilot testified that in his thirty-four years of flying, he had seen the windshield wipers used on takeoff only three or four times.
 

 A taxi down the length of the runway would also have been an exceptional deviation from the normal routine. There was some evidence that it is generally thought necessary for an aircraft to get out of the runway environment as quickly as possible at uncontrolled airports like Watertown where aircraft need not have a radio to ask permission to land. Further, the testimony of the co-pilot indicated that the Saberliner’s clearance for takeoff was good only for four or five minutes from the time it was received, and if the Saberliner was not airborne by that time, the clearance would become void. Though it does not appear from the record how much time the Saber-liner had left on its clearance at the point at which it reached runway 17-35, the fact that there appeared to be definite time constraints on the takeoff suggests that the crew would not normally taxi the runway in search of birds unless there had been a considerable reason to think that the birds were there.
 

 Similarly, the use of a different runway would seem quite unusual in the absence of a definite warning. Runway 17-35 was the “favored” runway because of the wind direction and, though the pilot was not required to use it, unless he had some reason not to, it was the runway he would prefer. There is no real suggestion that the gulls were more likely to be on one runway than another; the most that can be said about the advantage runway 12-30 had over 17— 35 with respect to birds is that 12-30 was more visible to the FSS and that if there were birds there, the FSS would be more likely to know of it. Yet, the Saberliner crew had no reason to know this.
 

 Though it is possible that the use of landing lights oh take-off might have frightened away the gulls, there is no convincing evidence in the record that this would have guaranteed an accident-free flight. Rather, the record has extensive references to the unpredictability of the birds, and the difficulty of finding any reliable method to prevent them from coming to the airport or to scare them away once there. It certainly cannot be considered negligence to have failed to use a possibly unreliable precaution.
 

 Finally, there is the question of whether the crew should have looked more closely at the runway when they reached the north end from the taxi ramp, that the pilot should have seen the gulls while he watched the runway as the Saberliner accelerated down the runway for take-off, and that the co-pilot should have spent part of the takeoff helping to watch for birds. As to this last point it must be observed that the evidence shows that the usual procedure in a Saberliner was that which was followed that day — that the co-pilot should spend his time on take-off looking at the instruments. As the co-pilot himself testified, when asked if he ever looked up from the time the Saberliner reached the runway to the
 
 *1227
 
 time it left the ground, “I got too many jobs in there. If you distract yourself for a brief second, then you get behind the airplane. Things are happening too fast. I have to call speeds and power settings and things that are happening pretty fast and you have got to really concentrate on what you are doing or you will miss it, get behind it.” Thus, the alteration of what appears to have been a very sensitive take-off procedure in order to allow the co-pilot to help the pilot watch the runway would not seem justified unless the Saberliner crew had some strong reason to suspect the presence of birds.
 

 Further, and of great importance in determining the crew’s negligence, there must be considered the sheer difficulty of seeing the gulls. The gulls were apparently at a point about 3,500 feet from the north end where the Saberliner turned onto the runway. On a clear day, several pilots testified, you could see at least 6,000 feet down the 6,900 foot runway. But the day of the accident was overcast and rainy. If the visibility was a mile and a quarter, or 6,600 feet, then the 3,500 foot point should have been visible. If the visibility was what the pilot reported, either a half-mile (2,640 feet) or three-quarters of a mile (3,960 feet) or “maybe more”, the 3,500 foot point would be on the edge of visibility. But the inquiry could not end here, because there are also the gulls themselves to be taken into the reckoning.
 

 Though Franklin gulls have a twenty-seven inch wingspan, their bodies are small, less than ten ounces, and low to the ground, less than ten inches high. The gulls mainly involved in this accident, which were of an immature age, were of a mostly white and gray color. It is evident that on the clearest of days, such a bird would be difficult to see, especially on pavement, and that on a grey, overcast day such as that on the day of the accident, the birds would almost completely blend into their background.
 

 Under South Dakota law, if a plaintiff has a duty to maintain a lookout, and if he does look, “it is implied that he looked effectively and in such a manner that he would see what was in plain sight unless some reasonable excuse for not seeing is shown.”
 
 Cowan
 
 v.
 
 Dean,
 
 81 S.D. 486, 137 N.W.2d 337, 342 (1965). Further, if there was a shortened visibility on the day of the accident, the Saberliner crew should have at least used heightened vigilance to keep a lookout for obstructions that might have been outside their range of vision, see
 
 King v. Farmers Educational & Cooperative Oil Co.,
 
 72 S.D. 280, 33 N.W.2d 333 (1948); but at the same time, “[i]f an object is so well camouflaged as not to be discernible within the range of ... vision [an actor] may not be held to the duty of seeing it.”
 
 Dwyer
 
 v.
 
 Christensen,
 
 76 S.D. 201, 75 N.W.2d 650 (1956). This rule has mainly been applied in cases where unlit or poorly lit vehicles were encountered on the highway at night. In
 
 Corey v. Kocer,
 
 86 S.D. 221, 193 N.W.2d 589 (1972), for example, plaintiff collided with the back of a slow-moving combine which was not exhibiting any red lights to the rear. “If any duty [to take a precaution] existed, it did not arise until [plaintiff] discovered the falsefront or ‘camouflaged’ danger defendants had created.” 193 N.W.2d at 597. Or, in
 
 Audiss v. Peter Kiewit Sons Co.,
 
 190 F.2d 238 (8th Cir. 1951), a case decided under South Dakota law, defendants were operating a poorly lit dark green road roller in the dark. It was either stopped, or barely moving, and plaintiff’s deceased, unable to see the roller, collided with it. In reversing the trial court’s dismissal of the complaint, the court of appeals said “a driver is not held to the duty of seeing objects which are not discernible. No one would hold a driver to the duty of seeing an object perfectly camouflaged on the road within his range of vision.” 190 F.2d at 242.
 
 See also Knapp v. Styer,
 
 280 F.2d 384 (8th Cir. 1960);
 
 Winburn v. Vander Vorst,
 
 75 S.D. 111, 59 N.W.2d 819 (1953).
 

 This Court has no difficulty in determining that, given the authority of the cases just cited, the crew of the Saberliner had a “reasonable excuse for not seeing” the gulls on the runway in time to avoid the accident, given the color of the gulls and the weather
 
 *1228
 
 conditions, and the necessary speed generated for take-off. Further, under the three factors analyzed in
 
 Associated Engineers, Inc. v. Job,
 
 370 F.2d 633, 641 (8th Cir. 1966) in “appraising the quality of a plaintiff’s negligence: the precautions he took for his own safety; the extent to which he should have comprehended the risk as the result of warnings, experience, or other factors; and the foreseeability of injury as a consequence of his conduct,” this Court is unable to conclude that the actions of the crew contributed in any significant way to the accident. The pilot did check to see if there were any NOTAMs issued for the Water-town airport; this precaution was ineffective only because Watertown had failed to issue any warning of the presence of birds. The Saberliner crew did look down the runway before embarking on the take-off. That this was ineffective is due largely to the “camouflaged” nature of the gulls. There is nothing in the record to show that the Saberliner crew could be charged with more than a highly generalized awareness that birds were a hazard, and that there was always a possibility that birds could be at an airport.
 
 [14]
 

 Finally, there is nothing to indicate that injury was in any way foreseeable as a consequence of the crew’s conduct. The record is replete with indications that the crew followed their normal procedures on takeoff, and that any deviation from these procedures as a precaution against unknown hazards would not have been reasonable, given the circumstances. Though the crew could possibly have taken a longer look at the runway before beginning their take-off, they did at least look; and this Court cannot say that they “blindly” or “heedlessly” proceeded into a zone of danger.
 
 See Engel v. Stock,
 
 88 S.D. 579, 225 N.W.2d 872 (1975);
 
 Pleinis v. Wilson Storage and Transfer Company,
 
 75 S.D. 397, 66 N.W.2d 68 (1954);
 
 Friese v. Gulbrandson,
 
 69 S.D. 179, 8 N.W.2d 438 (1943).
 

 Considering everything that has been discussed to this point, the Court can perceive no conduct on the part of the Saberliner crew which amounted to a breach of their duty to protect themselves. It follows from this that the actions of the pilots were no proximate cause of the accident, and can in no way be held to be contributorily negligent. Since the Saberliner crew was not causally negligent, there is thus no need to consider the application of the comparative negligence statute, SDCL 20-9-2.
 

 Judgment will therefore be entered for plaintiff against defendant City of Water-town for the full stipulated value of the crashed Saberliner.
 

 The foregoing represents the findings of fact and conclusions of law of the Court.
 

 [1]
 

 . At all times material the airport served North Central Airlines [now Republic Airlines], a CAB-certificated air carrier.
 

 [2]
 

 . “[t]he District courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States . . . under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.” '28 U.S.C. § 1346(b).
 

 [3]
 

 . The Coast Guard need not undertake the lighthouse service. But once it exercised its discretion to operate a light on Chandeleur Island and
 
 engendered reliance on the guidance afforded by the light,
 
 it was obligated to use due care to make certain that the light was kept in good working . order.
 
 Indian Towing Co. v. United States,
 
 350 U.S. 61, 69, 76 S.Ct. 122, 126, 100 L.Ed. 48 (1955). (Emphasis supplied)
 

 [4]
 

 .
 
 See
 
 Restatement of Torts 2d, §§ 323(a), 324A(a). It could hardly be said that the mere fact that the FAA issues certificates and conducts yearly inspections increases the “actual danger of harm” contemplated by these sections. Certainly, the gulls did not become more numerous
 
 because
 
 of the FAA’s additional regulatory activity at the Watertown airport; any increased risk of harm in this case would have to result from a reliance by third parties on some expectancy that the FAA’s certificate and inspections were a guarantee of a bird-free environment. As this opinion makes clear, plaintiff has failed to prove any such reliance.
 

 [5]
 

 . Although [inspection] functions are carried out pursuant to statute or to regulations, they do not arise from a primary duty to provide the service in question . . . the government does not purport to relieve other actors of the primary duty to see that the underlying activity is accomplished safely or consistently with some other important public policy.
 
 United Scottish,
 
 614 F.2d at 193.
 

 [6]
 

 .
 
 See
 
 Restatement of Torts, Second, § 344:
 

 A possessor of land who holds it open to the public for entry for his business purposes is subject to liability to members of the public while they are upon the land for such a purpose, for physical harm caused by the accidental . . . harmful acts of . . . animals, and by the failure of the possessor to exercise reasonable care to
 

 (a) discover that such acts are being done or are .likely to be done, or
 

 (b) give a warning adequate to enable the visitors to avoid the harm, or otherwise protect them against it.
 

 See also
 
 § 343:
 

 A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he
 

 (a) Knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and
 

 (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and
 

 (c) fails to exercise reasonable care to protect them against the danger.
 

 Section 344 was adopted by the state supreme court in
 
 Nicholas v. Tri-State Fair & Sales Association,
 
 82 S.D. 450, 148 N.W.2d 183 (1967); Section 343 has been recognized by
 
 Norris v. Chicago, M. St. P. & P. R. Co.,
 
 74 S.D. 271, 51 N.W.2d 792 (1952).
 

 [7]
 

 . Jacobson took off on runway 17-35 in his Cessna 182 shortly before 3 p. m. the day of the crash, approximately one hour and forty minutes before the Saberliner take-off.
 

 [8]
 

 . Because of this testimony, this Court does not find that plaintiffs separate allegation that Watertown encouraged the presence of gulls by conducting farming operations on the airport property, is a valid basis of liability.
 

 [9]
 

 . Watertown’s airport operations manual required daily inspections, which were normally conducted once a day at 8:00 A.M. At the time of the accident which occurred on a Saturday, however, no inspections were made on the weekend.
 

 [10]
 

 . There was some testimony that bird warnings should be given by AIRADs (aircraft advisories) rather than NOTAMs, but the record makes clear that there is no real difference between the two warnings.
 

 [11]
 

 .
 
 See also
 
 14 C.F.R. §§ 139.57(c), 139.85, 139.-89(c); Exhibit 65, Department of Transportation, FAA, 1975 Flight. Services Manual, p.56 (“Airport management is responsible for observing and reporting the condition of landing areas.”)
 

 [12]
 

 . The same point would seem to refute an argument that a temporary warning should have been issued on June 14, 1975 because the weather may have made the presence of gulls more likely; there is no proof that the FSS personnel knew of this debated circumstance, and certainly the airport management was in a better position to pass such a judgment.
 

 [13]
 

 . In all actions brought to recover damages for damages to a person or to his property caused by the negligence of another, the fact that the plaintiff may have been guilty of contributory negligence shall not bar a recovery when the contributory negligence of the plaintiff was slight in comparison with the negligence of the defendant but in such case, the damages shall be reduced in proportion to the amount of plaintiffs contributory negligence.
 

 [14]
 

 . ■ Implicit in the argument that the Saberliner crew should have used greater precautions regardless of the presence or absence of a bird NOTAM for Watertown is an assumption that NOTAMs are not a true guide, and that many airports have bird hazards, yet do not bother to warn. This Court is without sufficient evidence to make a finding of the accuracy of this assumption. In any event, this Court expressly holds that a failure of other airports to warn of bird hazards did not relieve defendant City of Watertown of its duty to issue a warning of the hazard at its airport.