**Joan S. NEFF, Administratrix of the Estate of John W. Neff**

v.

**UNITED STATES of America, Appellant.**

**No. 22262.**

United States Court of Appeals District of Columbia Circuit.

Argued May 5, 1969.

Decided Oct. 10, 1969.

Petition for Rehearing Denied Dec. 12, 1969.

Miss Kathryn H. Baldwin, Atty., Dept. of Justice, with whom Mr. Edwin L. Weisl, Jr., Asst. Atty. Gen. at the time the brief was filed, Messrs. David G. Bress, U. S. Atty. at the time the brief was filed, and John C. Eldridge, Atty., Dept. of Justice, were on the brief, for appellant. Messrs. Stephen R. Felson and Alan S. Rosenthal, Attys., Dept. of Justice, also entered appearances for appellant.

Messrs. Richard W. Galiher and Charles J. Steele, Washington, D. C., for appellee.

Before BURGER,* TAMM and LEVENTHAL, Circuit Judges.

TAMM, Circuit Judge:

On the afternoon of July 2, 1963, Mohawk Airlines Flight 112 took off from

---

* Circuit Judge Burger (now Chief Justice) did not participate in the disposition of this case.

Rochester-Monroe County Airport in Rochester, New York, carrying forty passengers and a crew of three. Moments after it lifted from the runway, Flight 112 flew head-on onto a violent thunderstorm, veered out of control, and plunged to earth; seven persons perished in the crash. One of the deceased was John W. Neff, an employee of Mohawk Airlines and the First Officer on Flight 112. Neff's widow, who is the administratrix of his estate and a resident of the District of Columbia, brought an action for wrongful death in the District Court under the Federal Tort Claims Act, 28 U.S.C. § 1346(b) (1964), claiming that the United States was negligent in operating the control tower and related weather facilities at the Rochester Airport. The trial court held that the control tower personnel were negligent in failing to warn the crew of Flight 112 that a thunderstorm was on the field at the time when they attempted to take off,[1] and that "First Officer Neff was not contributorily negligent in fact or in law" (App. 39). Accordingly, a judgment was entered for the plaintiff in the amount of $334,149.21, and the United States subsequently appealed that judgment to this court. We reverse.

The appellant suggests numerous possible reasons for reversal, including four grounds for holding that First Officer Neff was contributorily negligent: (1) he attempted to take off into a known thunderstorm; (2) he failed to use the weather radar on board the airplane; (3) he piloted the airplane during takeoff, despite the fact that he was not formally qualified to act as Captain of that type of aircraft under company regulations; and (4) he failed to abort the takeoff before the aircraft encountered the thunderstorm then advancing down the runway. Since we have concluded that First Officer Neff's attempt to take off into an obvious thunderstorm constituted contributory negligence as a matter of law, we need not pass upon the merits of the appellant's other contentions.

Under the Federal Tort Claims Act, the existence of a right to recovery is determined by state law—in this case, by the law of New York, the situs of the accident. In New York, the plaintiff in a negligence action normally has the burden of showing that he was free from contributory negligence, as an element of his cause of action; the New York wrongful death statute is an exception to this general rule, however, and it imposes on the defendant the burden of pleading and proving contributory negligence as an affirmative defense.[2] Thus, as the trial court observed, the United States had the burden of showing that First Officer Neff was contributorily negligent (App. 39). We think that the facts found by the District Court reveal that the Government fully discharged this burden.

Appellee cites a number of New York cases which stand for the propositions that contributory negligence is an issue which is largely within the province of the trier of facts, and that "contributory negligence as a matter of

---

1. The trial court summarized its holding on the negligence issue as follows (App. 34):

    The short of the matter is that if the Government representatives, particularly those in the control tower, failed to see the storm on the field they were negligent. If they saw it and failed to notify the plane after it left the ramp under the circumstances existing in this case they were negligent.

    The Government had a duty to provide the taxiing plane with all significant relevant weather information. This duty existed whether or not specific reg-

    ulations or operating practices required that particular weather information be transmitted.

    In light of our disposition of this appeal, we intimate no opinion as to the propriety of this holding.

2. N.Y. Estates, Powers & Trusts Law § 5–4.2 (McKinney's Consol.Laws, c. 7–b, 1967):

    On the trial of an action to recover damages for causing death the contributory negligence of the decedent shall be a defense, to be pleaded and proved by the defendant.

law is usually established only upon unusual or exceptional factual situations." Greelish v. New York Central R. Co., 29 A.D.2d 159, 286 N.Y.S.2d 61 (1968); *see also* Tyrell v. New York, 6 A.D.2d 958, 176 N.Y.S.2d 530 (1958). In the instant case, however, much of the evidence adduced at trial consisted of depositions; thus, the trial judge's advantage of being able to assess demeanor and credibility is less compelling than usual. Moreover, we do not take issue with the evidentiary facts—the sequence of events —found by the trial court; we merely conclude that the ultimate finding on the issue of contributory negligence was erroneous. It is well established that "[c]ontributory negligence may consist not only in a failure to discover or appreciate a risk which would be apparent to a reasonable man, * * * but also in an intentional exposure to a danger of which the plaintiff is aware." W. Prosser, Torts 434 (3d ed. 1964); *see also* Friedman v. Beck, 250 App.Div. 87, 293 N.Y.S. 649 (1937). Under this standard, First Officer Neff must be deemed guilty of contributory negligence.[3]

Since the precise sequence and timing of events preceding the crash of Flight 112 is crucial to the issue of contributory negligence, we shall set forth substantial excerpts from the careful and detailed fact findings of the trial judge, together with relevant portions of the testimony offered at trial. The essential geographical features of the crash scene consist of the main runway, Number 28, which runs east and west, and the control tower and its adjacent weather station, which lie to the south of this runway, approximately halfway along its 5,500 foot length. The trial court found that the following events transpired there on the afternoon of July 2, 1963:

*3:13 p. m.* Captain Dennis and First Officer Neff took over the Martin 404, a twin-engine piston-type aircraft, at Ithaca [New York] and left for Rochester. There was a line of "quite intense" thunderstorms * * * running NE to SW about 75 miles from Ithaca toward Rochester. Captain Dennis and First Officer Neff were aware of this condition.

*3:40 p. m.* The plane arrived at Rochester * * *.

*3:50 p. m.* The crew went to the Operations Office in the terminal and spent some time reviewing the weather and flight information available.

Mohawk's customer service agent at Rochester spoke to Captain Dennis and First Officer Neff and mentioned an aviation severe weather forecast. All current weather [information], including a 4:00 p. m. hourly weather report set out below, came to the attention of the crew. * * *

* * * * * * *

Rochester—ceiling 4,000 feet broken clouds, visibility 7 miles, * * scattered thunderstorms. Possible briefly ceilings 500 feet, sky obscured ½ mile visibility, heavy thunderstorms, hail, wind from the west at 40 knots with gusts to 65 knots. Chance isolated tornado. * * *

*All Mohawk Stations*

Post for Pilots and pass to any flights into areas mentioned.

Weather Bureau severe weather forecast indicates along and 60 miles either side from 60 miles southeast of Buffalo, N. Y. to 50 miles north-

---

3. In addition, the trial court relied upon the "well-established presumption that airline pilots act with diligence and due care when their lives are at stake" (App. 39). This presumption undoubtedly has great utility in many negligence actions arising out of airline accidents, since testimonial evidence is frequently sparse or nonexistent in such cases; here, however, both parties produced an abundance of evidence and it was possible for the trial court to reconstruct the events leading up to the crash in exhaustive detail. Thus, any effect that the presumption might have had was certainly overcome; *cf.* Bratt v. Western Air Lines, Inc., 169 F.2d 214 (10th Cir.), cert. denied, 335 U.S. 886, 69 S.Ct. 239, 93 L.Ed. 425 (1948); Rowe v. United States, 272 F. Supp. 462 (W.D.Pa.1964).

east of Burlington, Vt., expect scattered severe thunderstorms with extreme turbulence, hail to 1½ inches in diameter and maximum surface gusts 65 knots. Possibly an isolated tornado or two. Squall line * * * expected to intensify and move east south eastward at 40 knots.

*   *   *   *   *   *

*Aviation Severe Weather Forecast*

Weather warning Kansas City Urgent * * * July 2, 3:15 PM EDT

Aviation Severe Weather Forecast Area one [evidence showed Rochester is in Area one]—Tornado forecast

A—Along and 60 miles either side of a line from 60 miles southeast of Buffalo, N. Y. to 50 miles northeast of Burlington, Vt. * * *

B—Scattered severe thunderstorms with extreme turbulence. Hail to 1½ inches in diameter. Maximum surface gusts 65 knots. Possibility of an isolated tornado or two. * *

*   *   *   *   *   *

*4:30 p. m.* Captain Dennis signed the flight plan for flight 112. * * *

*4:40 p. m.* Thunder was officially heard at the airport weather station causing Chapman, who was then on duty, to make a special weather observation * * *. *This may be considered the official beginning of the thunderstorm near the field.*

About this time the crew and passengers boarded the aircraft. * * * *Some passengers and the stewardess heard thunder and saw lightning. All agree that the sky was dark and getting darker. While the wind was generally mild, there were strong gusts from time to time.*

(App. 21–23; emphasis added.) At this point it is appropriate to note what connotations the foregoing weather reports and physical phenomena must have had for the crew of Flight 112. A meterological expert from the United States

Weather Bureau testified that the term "severe thunderstorms" encompasses weather that is "characterized by strong shifting winds, both at the surface and aloft, almost always accompanied by hail" (App. 350). He further stated that the phrase "extreme turbulence," which was contained in one of the weather reports made available to the crew, referred to winds that would "render an aircraft uncontrollable at times" and also "could cause structural damage to the aircraft" (*Id.*). Mr. Donald Loudin, who had been employed by Mohawk Airlines as a flight instructor for approximately two years immediately preceding the date of the crash, testified that Mohawk pilots were trained in meteorology and the interpretation of weather reports (App. 429–30). He also stated that pilots were trained that "it was basic to avoid a thunderstorm, certainly not take off or land in one, avoid them whenever possible" (App. 431).

A Weather Bureau Manual of Surface Observations which was admitted into evidence at the trial (Tr. 1148) indicates that thunderstorm activity is evidenced by "thunder heard within past 15 minutes" or "overhead lightning or hail observed within the past 15 minutes." Here, the trial court found that the stewardess and some of the passengers heard thunder and saw lightning at the time they were boarding the aircraft; in addition, the following conditions were found to exist at about 4:45 p. m. when Flight 112 began to taxi out of the terminal area:

[R]ain began to fall and became quite heavy at times so that the plane's windshield wipers were operating. Wind was gusty at times but generally mild. There was a swirl dust storm east of the start of runway No. 28 noticed by one observer not in the plane.

When flight 112 reached the runup position there was some thunder, rain, and lightning off the field, *and a bit of hail had fallen. All of these weather manifestations are typical of thunderstorms.*

(App. 24–25; emphasis added.) The violence of the weather prior to takeoff is attested by the fact that the stewardess on Flight 112 stated in a deposition that the rain during this time "[s]ounded like heavy stones being thrown at the airplane" (App. 321). This testimony was corroborated by another Mohawk pilot, who had flown into Rochester Airport at about 4:40 p. m. At about 4:46, he stated, he was parked near the terminal, and observed that "rain began to fall, accompanied by a sharp increase in wind velocity, hail. Then very intense rain, a downpour." (App. 470–471).

At 4:45 p. m., then, Flight 112 was approaching the eastern end of Runway 28, preparing for takeoff. According to the trial court's findings:

When flight 112 stopped just off the runway in position to move immediately into takeoff position, the rain was increasing. Runway lights were on. Visibility was still over one-quarter of a mile down the runway from the plane's cockpit. About halfway down the runway, approximately 2,700 feet and almost directly opposite the tower, there appeared to be a dark wall of rain moving from west to east up the runway toward the plane. *This could be seen from the plane* and the tower.

*4:46 p. m.* The tower authorized the American Airlines flight [which had taken off at 4:45] to turn westbound to get out of the precipitation.

*4:48 p. m.* The American Airlines flight advised the tower that it would like to go a little bit further south to get away from chop and permission was granted by the tower.

At the same approximate moment * * * Mohawk 112 was cleared for takeoff on runway No. 28. With the plane still in the runup position, Captain Dennis called the tower stating, "We would like to make a left turn as soon as practicable to avoid those thunderstorms coming in from the west."

At this moment a visibility instrument known as a transmissometer located so as to give readings of runway visibility at about the middle of the runway suddenly recorded a sharp drop from a four-mile visibility reading to [a] one-eighth of a mile visibility reading. The thunderstorm was on the field. * * *

* * * * * *

*4:50 p. m.* [After receiving clearance from the tower] Flight 112 moved onto the runway and almost immediately took off down the runway, picking up speed. The plane was still on the runway when it entered the dark rain wall area opposite the terminal. The plane promptly then left the ground, encountered lateral and vertical turbulence * * * commencing at about a 15-foot height, rose to around 100 feet into violent turbulence, tilted left, right, and again left, and went into a semi-nose-up stall and crashed on the airport grounds * * *.

(App. 25–26.) On these facts, the trial court rejected the Government's claim of contributory negligence because "there is no definite demonstration that the crew was sufficiently alerted to the imminence of a thunderstorm on the runway to warrant * * * extra precautions" (App. 36). We cannot agree. In light of their training and the weather reports available to them, the flight crew must have known that thunderstorms were likely to hit the field at about the time that they were scheduled to take off; the thunder and lightning, which were noticed by the stewardess, some passengers, and other observers at the airport, should have alerted them to the considerable likelihood that they would encounter thunderstorm activity during the initial stages of their flight. Finally, they could scarcely have failed to notice the precipitation striking the plane prior to takeoff, which the stewardess stated "[s]ounded like heavy stones being thrown at the airplane." Hailstones are a clear indicator of violent thunderstorm activity, and the crew should have known this fact by virtue of their train-

ing; yet they disregarded all these signs of serious danger and attempted to take off.

The magnitude of the flight crew's negligence is not materially lessened by the fact that an American Airlines flight was cleared for takeoff just prior to the time that Flight 112 entered the active runway, or by the clearance for takeoff which the tower communicated to the crew seconds before the fatal crash. Neither the tower's silence regarding the storm nor the two foregoing factors could fairly be exalted into a Governmental representation that would justify the pilots in claiming "reliance" sufficient to warrant disregard of the apparent signs of danger.

The control tower procedures involved in "clearing" a flight and supervising it until it leaves the airport's area of responsibility are necessarily complex, and require the flight controllers to monitor a number of near-simultaneous events. The sequence of procedures established at Rochester Airport during the relevant time period usually started when an airplane parked at the terminal building called the Ground Controller in the tower on a designated frequency and asked for taxi instructions. The Ground Controller would then clear the aircraft to taxi to a designated runway, contact the Cleveland Air Route Traffic Control Center in order to obtain a clearance for the desired air route, transmit this clearance to the aircraft, and give the pilot the wind velocity and direction, an altimeter setting, and a time check (App. 113, 116–118, 151–152, 277). When the aircraft was ready to enter the active runway, the Ground Controller would advise the pilot to contact the Local Controller and obtain clearance for takeoff; this clearance was granted if there were no obstructions or conflicting traffic and the prevailing visibility at the airport was above specified minimums. Shortly after takeoff, the Local Controller informed the pilot to change frequencies and contact the Departure Controller. The Departure Controller then followed the aircraft on radar until the flight reached a prede-

termined point at which it came under the jurisdiction of the Cleveland Center (*see* App. 151–152, 273–279).

Thus, it seems clear that no prudent pilot would have construed a clearance for takeoff as implying anything more than the fact that visibility was above specified minimum criteria. Under the prevailing regulations, the Rochester Tower was not authorized to withhold takeoff clearance unless the prevailing visibility at the airport, or the visibility along the runway of departure, was less than a quarter of a mile (App. 183). The last official Weather Bureau observation taken at Rochester Airport before the crash, which was recorded at 4:43, showed eight miles of visibility; the special observation made by the Weather Bureau immediately after the crash at 4:52 showed one-half mile of visibility (App. 480–481). In addition, the trial court found that immediately prior to the takeoff of Flight 112, "[v]isibility was still over one-quarter of a mile down the runway from the plane's cockpit" (App. 25). One of the plaintiff's expert witnesses corroborated the fact that a clearance for takeoff is not understood as being an instruction to take off, or an implied representation that it will be safe for that particular airplane to take off at that particular time (App. 221–222; *cf. id.* at 201, 151–152); instead, the ultimate decision is the pilot's, since, as the trial court noted, "[t]he crew knows the condition of the aircraft, its capabilities, and must deal with the unusual and unexpected in flight" (App. 27). While the need for reserving the final decision to the pilot may be ascribable primarily to possibilities of engine or mechanical failure and the like, the fact that the duty to exercise final judgment is reposed in the pilot necessarily requires him to be alert to last-minute changes outside the airplane as a possible reason for either aborting the flight on his own responsibility or seeking further data from the controller. Conceivably other circumstances, such as an intensely busy airport at peak travel time, could narrow the pilot's latitude; but in the

circumstances before us no binding mandate can reasonably be inferred from the controller's clearance, and the pilot's decision to go ahead as cleared reflected lack of due care.

Similarly, we think it is plain that under the procedures found to exist at the Rochester Airport when the fatal crash occurred, the tower was primarily concerned with the problems of keeping track of all of the aircraft within its jurisdiction and minimizing the risk of collision; weather considerations were accorded a lower order of priority. Tower personnel received weather training that was little, if any, better than that which airline pilots were given. According to one witness, the controllers' training as "visibility observers" consisted of "self-study with supervision" and a test administered by the United States Weather Bureau (App. 126). While it is true that the tower operators had available instantaneous communications with the adjacent Weather Bureau office, their duty to make weather observations under the applicable regulations was sharply circumscribed, and, in some particulars, rather ambiguous. The basic rule in effect at the time provided that the controllers had the duty of making weather observations and reporting them directly to pilots and the Weather Bureau only when visibility dropped below four miles (App. 280). In addition, a portion of the Air Traffic Control Procedures Manual which was introduced at trial provided:

> Airport traffic controllers *may* transmit to pilots and air traffic control facilities without prior reference to the weather reporting station elements of weather information derived directly from instruments or radar, such as wind direction and velocity, * * * locations of storms and areas of precipitation. Observed general weather conditions such as "large breaks in the overcast," "visibility lowering to the south," or similar statements which do not include specific values, *shall* be transmitted and *should* also be forwarded to the local weather reporting station.

(App. 132–33; emphasis added.) This regulation probably should not be construed with the rigor applied to documents prepared by and for lawyers, but it at least indicates that the tower controllers' weather observing duties were limited and subject to some discretion.

The evidence presented at trial also indicates that most pilots were aware of the fact that tower personnel customarily accorded weather observations lower priority than traffic control. Several witnesses testified that a prudent flight crew, confronted with the information available to the crew of Flight 112, would probably have requested more detailed and up-to-date information from the tower immediately prior to takeoff. (*See* App. 202, 209–210, 419, 435.) Indeed, the trial court found that "[t]he customary and usual procedure would have been for the crew to ask the control tower for more information if, when the plane was in the runup position, there was reason for the crew to question the validity of the clearance given in light of the rain wall down the runway and the other weather manifestations which may have appeared to the crew at the time" (App. 36). As noted above, visibility down the runway was ample, and several people on board the aircraft observed the wall of rain on the runway. Unlike the trial court, we are unable to attribute substantial significance to the fact that "[i]t is difficult to judge speed of storms when in a cockpit on a runway" (App. 37); even if the storm had not been moving at all, it still would have presented a considerable risk. The determinative factor, we think, is that the wall of rain, together with the warnings received and the other indicia of the impending storm, should have made it obvious to the crew that there was at least a substantial risk they would encounter severe turbulence and other dangerous weather phenomena before they reached a safe altitude. Their attempt to take

off, in disregard of compelling signs of immediate danger, was contributory negligence and thus the judgment for the plaintiff-appellee must be

Reversed.