**INSURANCE COMPANY OF NORTH AMERICA and Asplundh Aviation, Inc., Plaintiffs,**

v.

**CITY OF NEW HAVEN, James E. Malarky and Edgar Schoonmaker, Defendants.**

**INSURANCE COMPANY OF NORTH AMERICA and Asplundh Aviation, Inc., Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

Civ. A. Nos. N–76–312, N–77–139.

United States District Court, D. Connecticut.

Oct. 6, 1983.

Thomas Wilson, Groton, Conn., James Courtney, Sussman, Shapiro, Wool, Brennan, Gray & Faulkner, New London, Conn., for plaintiffs.

Frank Santoro, Asst. U.S. Atty., New Haven, Conn., Kathlynn Fadely, Trial Atty., Torts Branch, Civil Branch, Dept. of Justice, Washington, D.C., for defendant United States of America.

Charles Albom and Karen Nash, Corp. Counsel, New Haven, Conn., Paul McNamara, Bridgeport, Conn., for defendants City of New Haven, James E. Malarky and Edgar Schoonmaker.

## MEMORANDUM OF DECISION

ZAMPANO, Senior District Judge.

The plaintiff, Insurance Company of North America ("INA"), as the subrogee of its insured, plaintiff Asplundh Aviation, Inc. ("Asplundh"), instituted these consolidated actions to recover stipulated damages of $300,000 to a Cessna Citation corporate jet which crashed on takeoff from Tweed-New Haven Airport on October 16, 1974. The crash occurred when the aircraft suddenly lost power after its engines ingested seagulls during takeoff.

Under various tort causes of action, the plaintiff sues the City of New Haven in diversity, Civil Action N–76–312, and the United States, Civil Action N–77–139, under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–80. During the bench trial, 13 witnesses testified, numerous exhibits were filed, and the Court and counsel visited the site of the accident. The Court would be remiss if, at the outset of this opinion, it did not commend counsel for their exceptional trial performance and for their comprehensive memoranda of facts and law.

## I.  FACTUAL BACKGROUND

### A) *The Tweed-New Haven Airport*

The Tweed-New Haven Airport is a small airport which is owned and operated by the City of New Haven, Connecticut under its proprietary function. The airport's two runways are located less than two thousand feet from Long Island Sound: Runway 02/20 is 150 feet wide and runs generally north-south for 5,600 feet and Runway 14/32 is 150 feet wide and runs generally east-west for 8,300 feet.

During the months of September and October 1974, approximately 100 planes flew in and out of the airport on a daily basis, of which 15 were jet-type aircraft. The jet traffic consisted largely of corporate aircraft and one commercial air carrier, Allegheny Airlines, which carried a total of over 2,000 passengers in this two month period.

In 1974, the Federal Aviation Administration ("FAA") maintained a facility at the airport in a glass enclosed tower elevated 45 feet above ground in an area adjacent to the runways. The controllers, who were on duty between 6:00 A.M. and 12 midnight daily, provided air traffic control services to aid in the safe, orderly and expeditious flow of air traffic. They performed all their duties from their positions in the tower and did not physically go onto the runways to inspect for hazards.

Physical inspections of the runways, taxiways, and surrounding areas were carried out daily by two employees of the airport. At 6:00 A.M. when the tower opened, Eddie Jinks would drive his vehicle onto the runways to check for any conditions that might be hazardous to air traffic. Between 7:00 A.M. and 8:00 A.M., Peter Gagliardi, the field foreman at the airport,

would conduct a similar inspection. As a general rule, neither Jinks nor Gagliardi would inspect the runways again unless they were specifically requested to do so by airport management or the FAA controllers.

### B) *Bird Hazard—In General*

During the mid-1960's, it became increasingly apparent to those involved in aviation that birds were a serious hazard to air traffic, particularly to propjets and full jet aircraft. The engines of these planes have large air intake openings which are likely to ingest birds. The birds, when ingested, may damage one or more of the rotating blades of an engine which, in turn, break off or bend the other rotating blades in the engine. The result is that the compressors in the engine become inoperative and the plane loses its power. The most dangerous times for bird-aircraft strikes to occur are when planes are taking off or landing.

Data gathering and intensive analysis of the problem commenced in the 1960's and continue to this date. From April 1961 to June 1967, over 2,000 bird-plane strike incidents were reported to the Air Transport Association, most of which involved jet aircraft. Over 80 per cent of the strikes occurred when planes were leaving from or arriving at airports. More strikes took place in the month of October than in any other month of the year. Studies revealed that a total of 73 species of birds were involved in bird-plane strikes from 1961 to 1967. Gulls and waterfowl were the most common species damaging aircraft.

The Herring Gull and the Ringed-billed Gull are of particular concern to air traffic in the Northeast. The Herring Gull averages 24 inches in length, has a wing span in excess of 40 inches, and generally weighs approximately three pounds. The Ringed-billed Gull is similar to the Herring Gull but somewhat smaller. These migratory birds tend to nest in the New England area, usually along the Atlantic seacoast on rocky inlets, sandbars and breakwaters.

At trial, Dr. William H. Gunn, a biologist who specialized in the study of bird behav-

ior, presented a comprehensive description of gulls' day-to-day activities, particularly as they relate to bird-aircraft strikes. The gulls roost at night and then start in their quest for food about 30 minutes before sunrise, usually along the beaches and shorelines. However, in periods of rain, heavy wind, or storms, the birds move inland for protection and to search for earthworms for food. Dr. Gunn also noted that gulls are not strong flyers and are unable to move rapidly into the air and gain flight. Undisturbed, they fly about individually but, if suddenly disturbed, they take off as a group facing the wind and as they get airborne are usually densely packed.

### C) *Bird Hazard at Tweed-New Haven Airport*

There is little question that in 1974, and for a long time prior thereto, gulls presented a hazard to air traffic at Tweed-New Haven Airport. Jinks and Gagliardi testified that during inclement weather they observed gulls on and near runways over 75 per cent of the time. At times they were required to remove dead, mangled gulls from the runways. Edgar Schoonmaker, the Assistant Manager of the airport, stated that on stormy days marked by rain and wind the bird hazard at the airport could be rated as a seven on a scale of one to ten. In the year prior to the accident in question, 30 bird-plane strikes were noted by airport personnel, two of which were serious enough to force the aircraft to abort the takeoff. Written management directives referred to "gulls and other birds" as constituting hazards to aircraft and instructed employees to clear the runways of birds promptly when observed.

The testimony of airport personnel confirmed Dr. Gunn's opinion that Herring Gulls and Ringed-billed Gulls would be especially attracted to the airport during rainy weather. Dr. Gunn pointed out that these gulls, roosting less than 2,000 feet from the airport property, would be likely to fly onto the runways in search of earthworms that had escaped to the concrete surfaces from rain saturated soil. Dr.

Gunn further explained that these gulls would tend to congregate on airport property during inclement weather because there they could establish firm footing on the runways and see for long distances in all directions.

### D) *The Accident*

On October 16, 1974, Senior Captain Alan Cornell and co-pilot Frank McKeon were assigned by their employer, Asplundh, to fly the company's Cessna Citation from Philadelphia Airport to Tweed-New Haven Airport to pick up a passenger, William Neidig, for a return flight to Philadelphia.

Cornell was an experienced pilot who had flown the Cessna Citation for more than 16 months and had logged 869 hours of his 3,659 hours total aviation time in this aircraft by the time of the accident. Co-pilot McKeon had 275 hours of flight time in the Cessna Citation out of a total aviation time of 532 hours. Cornell was quite familiar with Tweed-New Haven Airport, having piloted planes into it at least two dozen times prior to 1974; McKeon had never flown into the airport prior to the time of the accident.

The Cessna Citation was a six passenger plane with twin rear mounted jet engines affixed approximately five feet above the ground. The aircraft was 30 feet in length, 18 feet high at the highest point of the tail, with wing spans of 30 feet. The pilot sat on the left side of the plane with the co-pilot next to him on the right side.

Prior to takeoff from Philadelphia at about 5:30 A.M. on October 16, Cornell went to the local Flight Service Station to obtain weather data. He also checked to see if the Tweed-New Haven Airport had issued any Notice To Airmen ("NOTAM") warnings, which are designed to alert pilots to conditions (closed runways, bird hazards, construction, etc.) on or near the airport that may affect the safe operation of an aircraft. No NOTAMs concerning the airport were on file. After takeoff, Cornell and McKeon flew to Tweed-New Haven Airport under IFR (instrument flight rules) without incident, and landed shortly after 6:00 A.M. in foggy, rainy weather. Official sunrise was 7:03 A.M. The aircraft was parked in the ramp area in front of the tower and terminal building facing the threshold of Runway 02/20. During the landing and parking procedures, neither pilot noticed any gulls in the vicinity.

The plane remained in the ramp area until passenger Neidig's arrival. At 6:49 A.M., Cornell requested and received clearance from the ground controller for the return flight to Philadelphia. Cornell then proceeded, as instructed, to the taxiway for Runway 02/20 to prepare for takeoff. At this point, despite the limited visibility, co-pilot McKeon observed one or two gulls in the area adjacent to Runway 02/20, but did not report the sighting to Cornell.

When the aircraft reached Runway 02/20, the local controller ordered Cornell to "hold short" to permit a Navajo plane to land on that runway. The Navajo, a twin-engine, piston prop plane, touched down at a point slightly north of the Cessna Citation's hold short point. Within a minute later, at 6:58 A.M., the Cessna Citation began its takeoff roll down the runway. After travelling 2,000 feet, the plane achieved the necessary speed for takeoff. At this moment, Cornell observed gulls in front of the aircraft moving upward from right to left. Simultaneously, the pilots heard birds striking the windshield and sides of the plane. The left engine completely lost power, the right engine started to fluctuate, and the cabin filled with smoke.

Cornell, realizing that the engines had ingested gulls and that the aircraft was no longer functional, aborted the takeoff by cutting off all power to the engines and applying the brakes. The aircraft skidded down the runway, went through a fence, and came to rest in a creek. Damage to the plane totaled $300,000.

## II. NEGLIGENCE OF THE CITY OF NEW HAVEN

The parties agree that the traditional rules of negligence are applicable in this

case. The plaintiffs must prove that the City of New Haven owed them a duty of due care, that this duty was breached, and that the breach of duty was the proximate cause of the loss. See, e.g., *Coburn v. Lenox Homes, Inc.*, 186 Conn. 370, 372, 441 A.2d 620 (1982); *Merhi v. Becker*, 164 Conn. 516, 521, 325 A.2d 270 (1973).

## A) *The Duty Owed*

■ Under Connecticut law, the City of New Haven, as the owner and operator of a public airport, has "the duty of exercising reasonable care and control to protect its invitees from dangers which might reasonably be anticipated to arise from the conditions of the premises or the activities taking place there." *Merhi*, 164 Conn. at 520, 325 A.2d 270. See also *Kopjanski v. Festa*, 160 Conn. 61, 65, 273 A.2d 692 (1970); *Warren v. Stancliff*, 157 Conn. 216, 218, 251 A.2d 74 (1968). As pointed out hereinbefore, the occurrence of bird-plane strikes was, within the aviation world, a recognized hazard, particularly with respect to jet aircraft. The problem was known to be acute at airports located near the Northeast seacoast where large flocks of Herring, Ringed-billed and other gulls migrated to roost along the shores.

The record demonstrates that the management at Tweed-New Haven Airport had actual notice of the hazard to aircraft created by birds. The management issued memoranda and directives which reflected that the gulls were a "bird hazard" to aviation. Shift inspectors testified that gulls were present on the premises in substantial numbers from early spring to late fall, particularly in rainy weather. Birds mangled from hitting propellers and planes were often found on the runways. In 1973, during peak bird activity, there were over five bird-plane strikes reported each month, two of which resulted in aborted takeoffs. In sum, the record is replete with evidence that gulls were regular interlopers at the airport and that airport officials knew their presence was or could be a danger to the aviation public.

■ Thus, it is evident to the Court that at all relevant times herein, the City of New Haven owed a duty to pilots using its airport to exercise reasonable care to remedy the existing bird hazard, or at least to warn unsuspecting pilots of the peril. See *Safeco Insurance Co. v. City of Watertown*, 529 F.Supp. 1220, 1226 (D.S.D.1981); *Gothreau v. New York, N.H. & H.R. Co.*, 148 Conn. 65, 67, 167 A.2d 244 (1961); *Romenici v. Trumbull Electric Mfg. Co.*, 145 Conn. 691, 694, 146 A.2d 416 (1958).

## B) *The Breach of Duty*

The parties, by way of testimonial and documentary evidence, exhaustively explored various methods to attack the gull problem at the Tweed-New Haven Airport.

At the outset, it bears mention that as a practical matter it is impossible to eliminate gulls from intruding upon airport land. The only truly effective way to prevent some offending gulls from retreating to the airport during stormy weather would be to slaughter *all* the gulls year after year upon arrival at their roosting habitat on Long Island Sound. Obviously, the total, indiscriminate and inhumane massacre of these elegant birds is not a rational solution to the problem.

However, several remedial measures were available in 1974 to alleviate the bird hazard at the airport. These include: 1) removing the food supplies which lure the gulls to the property; 2) operating mobile bird-scanning patrols with scare devices throughout the airport; and 3) issuing appropriate NOTAMs to alert pilots to the danger.[1] The question presented is whether, to satisfy its duty of due care, the City of New Haven should have but failed to use one or more of these measures.

### *Land Modification*

■ There is no evidence that the City of New Haven failed in its responsibility to

---

**1.** It was also suggested that a "chemical" method for dispersing birds might have been utilized. However, the chemical control of bird hazards at airports was not yet proven effective in 1974 and even Dr. Gunn questioned its use.

make the airport less attractive as a food source for gulls. In 1974, the property had no garbage dumps, refuse heaps, sewer outfalls or other conditions which might have provided alluring food supplies. Undoubtedly, earthworms were on the runways in wet weather and did attract the gulls, but it would be unreasonable to require the airport management to clean the runway of worms.

*Scare Devices*

In 1974, and for several years prior thereto, the airport's management and employees were aware of the value of scare devices to disperse gulls resting and eating on the property. The device utilized at Tweed-New Haven Airport involved an employee driving an automobile at and through the flocks of gulls while blowing the car horn. As a general rule, this was done on the shift inspections at 6:00 A.M. and between 7:00 A.M. and 8:00 A.M. It was also employed when a pilot or other person reported the presence of gulls on the runways.

This technique had only a limited success because, as Dr. Gunn pointed out, gulls become habituated to the sound of the horn and gradually "learn" that it will not adversely affect them. The gulls merely become annoyed at the sound, fly off momentarily, and then return after the car passes. Employees of the airport confirmed that the car-horn device proved effective only as a short term deterrent.

The plaintiffs contend that another more effective method should have been used to disperse the birds. Dr. Gunn testified that a scare device consisting of the broadcast of a recorded gull's distress call was a highly recommended way to discourage the presence of birds on runways. Speaking to the gulls "in their own language," he explained, causes them to "pay attention" and to fly toward the vehicle emitting the distress call. Once the birds flock in the air over the vehicle, Dr. Gunn suggested that a shotgun be used to send "shell crackers" into their midst to frighten them off the property. Occasionally, he advised,

one or two birds should be shot "to get the message across that there's real danger in the area."

The plaintiffs argue that the airport's failure to utilize this more advanced technique to scare off the gulls constituted a breach of due care. The Court disagrees for several reasons. First, it has not been established, at least to this Court's satisfaction, that the distress call technique was significantly more effective than the use of the car-horn device. The literature on the subject indicated that gulls, particularly Herring Gulls, soon learn to dismiss the call as a signal of danger. Plaintiffs' Exhibit 17. In fact, studies revealed that although the recorded distress call method caused immediate different reactions from the birds than the more conventional scaring devices, "the long term effects are similar." *Id.* In addition, as Dr. Gunn admitted, use of live ammunition around an airport "may be of very personal concern" to pilots and travellers. Second, considering the state of the art at the time, the Court finds that the use of the car-horn device on the date of the accident was a reasonable exercise of due care under the circumstances. See, e.g., *Drible v. Village Improvement Co.*, 123 Conn. 20, 23, 192 A. 308 (1937). The use of the car-horn device to reduce the bird-aircraft hazard was, at least in 1974, a widely accepted procedure to deter birds. Most airports along the seacoast employed the device. For several years prior to the instant accident, the method proved adequate to disperse the gulls at Tweed-New Haven airport on a day-to-day basis. Although it is true that research was revealing some positive aspects of a distress call program, the procedure in 1974 was still in the experimental stages and not generally known to or utilized by owners and operators of airports.

NOTAMs

The NOTAM is, and was in 1974, the generally accepted method of advising pilots of a particular danger or condition at an airport which merits their special attention. In 1974, the NOTAMs were available to pilots at their local flight service stations

and were printed in the Airman's Information Manual. The management of the Tweed-New Haven Airport knew the value of NOTAMs to pilots using an airport, and had the ability and authority to issue a NOTAM alerting pilots to the bird hazard at the airport.

Despite their experience with gulls at the airport and the knowledge that the gulls constituted a peril to air traffic, airport officials failed to issue any type of warning to pilots by way of a NOTAM regarding the probable presence of gulls on the property during certain seasons of the year and under certain weather conditions. It is reasonable to assume that pilots, if on notice that there were bird concentrations at an airport, in the exercise of due care, would take cautionary measures to avoid possible bird strikes. See *Safeco*, 529 F.Supp. at 1228–29. These might include changes in route and altitude assignments, checking the runways personally before takeoff, requesting airport employees to employ scare devices upon arrival and departure, and other procedures.

In the Court's opinion, prudent care required the issuance of a NOTAM concerning the bird-aircraft hazard at the Tweed-New Haven Airport long prior to October 1974. The failure to do so constituted negligence.

C) *Proximate Cause*

In *Coburn*, the Connecticut Supreme Court defined proximate cause as "[a]n actual cause that is a substantial factor in the resulting harm" and emphasized that such a cause "may be found from the contributory negligence" of the plaintiff. 186 Conn. at 383, 441 A.2d 620. See also *Magarian v. Bessoni*, 160 Conn. 442, 445, 280 A.2d 357 (1971) (proximate cause is found by looking for necessary causal connection between injury and negligent act).

■ Applying these principles to the facts in the case *sub judice*, the Court is compelled to the conclusion that no negli-

gent act on the part of the Tweed-New Haven Airport was a proximate cause of the Cessna Citation's crash. Cornell testified that even if he had been given a warning of the bird hazard by way of a NOTAM, he would not have done anything differently on the morning of the accident[2] Tr. 3–61, 62. Compare *Safeco* (finding city liable based on fact that pilot would have used a variety of cautionary procedures on takeoff if NOTAM had warned of bird hazard). In addition, Cornell admitted that on the two dozen occasions he had flown into Tweed-New Haven Airport prior to the accident, he had observed gulls on the airport surfaces. Tr. 3–72, 73. Thus, the failure of the airport to issue a NOTAM concerning the presence of birds on the property could not have misled him and could not have been a proximate cause of the accident. As stated in *Stancliff*, "[t]he failure to warn an invitee of something he already knows is without legal significance." 157 Conn. at 220, 251 A.2d 74. See also *Black v. United States*, 441 F.2d 741, 744–45 (5 Cir.), cert. denied, 404 U.S. 913, 92 S.Ct. 233, 30 L.Ed.2d 186 (1971).

In the Court's opinion, the proximate cause of the accident was the failure of co-pilot McKeon to communicate to Cornell that he noticed gulls adjacent to Runway 02/20 just prior to takeoff. Tr. 4–20. Cornell had the duty to exercise final judgment on all critical aspects of the takeoff procedures. Necessarily, he was required to be alert to last minute changes in conditions outside the plane. Cornell testified that, had McKeon informed him gulls were in the area of takeoff, he would have sought further information concerning their number, size and location. Tr. 3–118, 119, 123.

Cornell was an experienced, competent pilot-in-command. If informed that gulls were near Runway 02/20, he would have had several options open to him. He could have delayed takeoff until he personally surveyed the area to estimate the extent of

2. This testimony was not surprising. Statistics reveal that only 11 per cent of pilots revise their flight plans because of bird hazards at airports.

the hazard. He could have sought further information from the control tower or requested airport employees to clear the area of the gulls. The Court is satisfied that, with a verbal warning of birds near the runway, Cornell would have recognized there was a substantial risk the aircraft would encounter gulls on takeoff and would have taken all necessary precautions to insure safe travel. McKeon was the only person who saw gulls that morning and was under a duty, as second-in-command, to relay that information to Cornell. Tr. 4–10. His failure to do so was the direct and proximate cause of the accident. See *Black*, 441 F.2d at 744–46; *Neff v. United States*, 420 F.2d 115, 120–22 (D.C. Cir.1969), cert. denied, 397 U.S. 1066, 90 S.Ct. 1500, 25 L.Ed.2d 687 (1970).

## III. NEGLIGENCE OF UNITED STATES

 The plaintiffs claim that the air traffic controllers at the Tweed-New Haven Airport were negligent in failing to advise the crew of the Cessna Citation that gulls were on or near Runway 02/20 on the morning of the accident. The United States acknowledges that its controllers had a duty to warn the plane crew of the dangers apparent to the controllers but claims they did not breach this duty. The Court agrees. The air traffic controllers are not employed to perform physical inspections of the runways. They can only rely on information received from airport management, pilots and on their own observations from the tower. The evidence was uncontroverted that neither controller on duty on October 16 saw or was informed that gulls were in the vicinity prior to the Cessna Citation's takeoff. Under these circumstances, there was no negligence on the part of either controller in granting the plane permission to takeoff. *Sellfors v. United States*, 16 Av.Cas. (CCH) 17,186, 17,187 (N.D.Ga.1980), aff'd mem., 697 F.2d 1362 (11 Cir.1983). In any event, the Court has found that the co-pilot's failure to report his sighting of gulls to the pilot was the proximate cause of the accident. Even a failure of the air traffic controllers to

warn the crew of the danger could not be considered a continuing proximate cause after the co-pilot had discovered the danger. See *Black*, 441 F.2d at 745.

Accordingly, judgment must enter in favor of all defendants and against all plaintiffs.